IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

COLBRO SHIP MANAGEMENT       *
COMPANY LTD.                 *
                             *
Plaintiff                    *         Civil No. 98-1052(SEC)
                             *
v.                           *
                             *
UNITED STATES OF AMERICA     *
                             *
Defendant                    *
*************************************

**OPINION AND ORDER**

This is an action to review a decision by the United States Coast Guard (hereinafter "USCG") assessing a $10,000 penalty against Colbro Ship Management Company Limited (hereinafter "Colbro") under the Clean Water Act, also known as the Federal Water Pollution Control Act, for the discharge of garbage mixed with plastic into the navigable waters of the United States. Pending are the parties' cross-motions for summary judgment. **(Dockets # 16 and # 21)**. Because the Court concludes that the USCG's determination that Colbro is liable for the discharge is supported by substantial evidence in the administrative record, and that the assessment of the civil penalty is not an abuse of discretion, it upholds the USCG's decision. Accordingly, defendant's motion for summary judgment is granted **(Docket # 16)**, and plaintiff's cross-motion **(Docket # 21)** is denied.

**Background**

The following facts are not seriously in dispute. Colbro is the operator and managing agent of the M/V Phoenix Spirit (hereinafter the "Phoenix Spirit"). **(Docket # 1, at ¶ 1)**. On May 22, 1995, the USCG Marine Safety Office in Miami, Florida received notification from USCG Station Marathon that a one Michael Schrader, operator of the vessel Tracy Lynn, had witnessed an "all wh[i]t[e]" freighter vessel with a "red waterline" and "no name visible on the stern" dump trash into

**Civil No. 98-1052(SEC)**                                                                 2

the United States' Exclusive Economic Zone (hereinafter "EEZ") off the coast of Florida. (**Docket # 16**, "Chronological Log of Case No. AN034," Enclosure No. 16 in Administrative Record No. MV95007099). The dumped trash consisted of "food, paper and plastic." (**Id.**). Based upon the offending vessel's general description and reported position, course and speed, the USCG conducted an investigation.

In the immediate vicinity where the alleged dumping occurred, USCG investigators found two vessels that matched the description of the offending vessel: the Tropic Lure and the Phoenix Spirit. There were two significant differences between these vessels. First, the Phoenix Spirit was white-hulled, whereas the Tropic Lure was grey-hulled. Second, the position of the Phoenix Spirit at the time of the alleged dumping was more consistent with the position of the offending vessel, as reported by Mr. Schrader, than the same relative position of the Tropic Lure. USCG investigators initially approached the Tropic Lure following alongside its course for a short while, but eventually let it go because the Phoenix Spirit's appearance and position at the time of the alleged dumping was more consistent with the information provided by Mr. Schrader. (**Id.**, "Statement of USCG SN Adam B. Vernon," Enclosure No. 2; "Statement by USCG BM3 Todd E. Hartfiel," Enclosure 4). USCG investigators then boarded the Phoenix Spirit to inspect it.

The master of the vessel stated that there were seventeen people on board the Phoenix Spirit, and that he did not know of any one dumping garbage overboard. During the inspection, the USCG found an amount of garbage which it determined to be "insufficient," in relation to the size of the crew and the voyage's duration since the last port of call where garbage could have been discharged. (**Id.**, "Details of the Charge"). Moreover, the master did not produce "any receipts for [the] last shoreside discharge nor receipts from any previous shoreside discharges." (**Id.**). The only

AO 72A
(Rev. 8/82)

**Civil No. 98-1052(SEC)**                                                                 3

documentation that the master of the vessel produced was a log entry for garbage delivered ashore five days earlier. (**Id.**). Also on board, the USCG found a white plastic bag in the wardroom mess, and various other containers partially filled with garbage mixed with plastic. (**Id.** Photograph No. 5, Enclosure No. 9). The USCG boarding team photographed all the garbage aboard the Phoenix Spirit, as well as the vessel itself.

Subsequently, Mr. Schrader positively identified the Phoenix Spirit as the transgressing vessel from the photograph taken by the USCG boarding team,[1] and gave a written statement concerning the incident that he had witnessed. In his written account, Mr. Schrader stated that he saw "one man throw a large white garbage bag off" a "a white cargo ship with red bottom paint and a black loading ramp on the stern[;]" that he approached said ship to "to inspect what had been tossed off" and found "a trail of garbage that came from a split open trash bag[;]" and that he recovered a "clear garbage lin[]er" containing "an empty alcohol bottle, a piece of banana, [and] a piece of manila envelope . . . without any I.D. markings . . . ." (**Id.**, "Statement by Michael L. Schrader," Enclosure No. 1).[2]

---

[1] This photograph was never included in the administrative record. (**Docket # 16**, Letter from David J. Kantor, Deputy Chief, by direction of the Commandant, Office of Maritime and International Law, to William J. Coleman, Colbro Ship Management Co., Ltd. (Oct. 7, 1997)).

[2] Interestingly enough, in one of his rebuttal letters, Colbro's president protests that "[c]lues of this nature would have made a very famous French comic detective determine that the evidence pointed to a drunken chimpanzee recently in receipt of a 'Dear John' letter from a former lover at the Bronx Zoo." (**Docket # 16**, Letter from William J. Coleman, President, Colbro Ship Management Company Limited, to Commander T.P. Talbot, Commander of the U.S. Coast Guard Atlantic Area (May 20, 1996)). Well, maybe not.

All the aforementioned information was referred in the form of an official report to the USCG hearing officer. On December 11, 1995, the hearing officer notified Colbro[3] of the initiation of civil penalty proceedings against it pursuant to 33 C.F.R. § 1.07, for the discharge of garbage mixed with plastic into the navigable waters of the United States. In the notice, Colbro was advised, *inter alia*, of the maximum ($25,000) and proposed ($10,000) penalties, and of its rights (a) to examine the case file, (b) to request a hearing or submit a written response, including any material or testimony to be considered, and (c) to be represented by counsel. Regarding the availability of a hearing, Colbro was advised of how to request it, and of the requirement to specify the issues to be raised. Finally, in regard to the size of the penalty, the hearing officer informed that his "preliminary review of the case file indicate[d] that a penalty of $10,000.00 [wa]s appropriate. . . ." (**Id.**, Letter from T.P. Talbot, Commander, U.S. Coast Guard, Hearing Officer, to Pitea Shipping Company Ltd. (Dec. 11, 1995)).

Colbro purportedly requested a hearing, although such request never materialized. (**Id.**, Letter from W.J. Coleman, President, Colbro Ship Management Co., Ltd., to R.A. Blais, Commander U.S. Coast Guard (Aug. 15, 1996)).[4] It also announced that it would formally request an opportunity

---

[3] The notice was originally sent to Pitea Shipping Company Limited. Colbro subsequently informed the USCG that it would be the respondent for any matter pertaining to the Phoenix Spirit. (**Id.**, Letter from William J. Coleman, President, to Ms. Nancy Cuty (Jan. 30, 1996)). Moreover, Colbro ratified this action as the real party in interest. (**Docket # 9**). Therefore, we shall only refer to Colbro in this opinion.

[4] In a letter responding to the hearing officer's decision, Colbro protested that a hearing was never held. In that letter, Colbro's president states: "We were under the impression that the last sentence of our letter of 20 May 96 requesting dismissal of the charges described in the Notice of Violation constituted a request for further hearing of this matter." (**Id.**, Letter from W.J. Coleman, President, Colbro Ship Management Co., Ltd., to R.A. Blais, Commander U.S. Coast Guard (Aug. 15, 1996)). The Court has reviewed the referred letter and has found nothing in it in the nature of a request for a hearing. The last sentence of that letter simply states: "We repeat our request for dismissal of the charges described in the Notice of Violation." (**Id.**, Letter from William J. Coleman,

**Civil No. 98-1052(SEC)**                                                                 5

to interview Mr. Schrader, but it never did. (**Id.**, Letter from William J. Coleman, President, Colbro Ship Management Co., Ltd., to T.P. Talbot, Jr., Commander (Ajs), U.S. Coast Guard Atlantic Area (Feb. 20, 1996)). Also, Colbro never availed itself of the assistance of counsel during the proceedings. Colbro chose instead to correspond back and forth with the hearing officer denying liability and challenging the sufficiency of the evidence.[5]

After reviewing all the evidence in the administrative case file, the hearing officer determined that the Phoenix Spirit was responsible for the discharge of garbage mixed with plastic into the United States EEZ, and assessed a penalty in the amount of $10,000. (**Id.**, Letter from R.A. Blais, Commander, U.S. Coast Guard, Hearing Officer, to Pitea Shipping Company, Ltd. (Aug. 7, 1996)). Colbro appealed the hearing officer's decision to the USCG Commandant, and on October 7, 1997, the USCG Commandant, through his designee, affirmed the decision by the hearing officer and denied Colbro's appeal. The Commandant also stated that his decision affirming the hearing officer's determination constituted the final agency action. (**Id.**, Letter from David J. Kantor, Deputy Chief, by direction of the Commandant, Office of Maritime and International Law, to William J.

---

President, Colbro Ship Management Company Limited, to Commander T.P. Talbot, Commander of the U.S. Coast Guard Atlantic Area (May 20, 1996)). This is certainly not a request for a hearing. A request for a hearing in civil penalty proceedings under 33 C.F.R. § 1.07 must be made in accordance with 33 C.F.R. § 1.07-25. Colbro did not comply with the latter.

[5] (**Id.**, Letter from W.J. Coleman, President, Colbro Ship Mangament Co., Ltd., to R.A. Blais, Commander U.S. Coast Guard (Aug. 15, 1996); Letter from R.A. Blais, Commander, U.S. Coast Guard, Hearing Officer, to Pitea Shipping Co. Ltd. c/o Colbro Ship Management Co. (Aug. 7, 1996); Letter from William J. Coleman, President, Colbro Ship Management Company Limited, to Commander T.P. Talbot, Commander of the U.S. Coast Guard Atlantic Area (May 20, 1996); Letter from T.P. Talbot, Commander, U.S. Coast Guard, to Pitea Shipping Co. Ltd. c/o Colbro Ship Management Co. (Apr. 19, 1996); Letter from Eric J. Mosher, by direction of the Commander, Seventh Coast Guard District, to Commander, Coast Guard Hearing Office South (Ajs) (Apr. 15, 1996); Letter from J.P. Talbot, Commander, U.S. Coast Guard, Hearing Officer (March 11, 1996); Letter from William J. Coleman, President, Colbro Ship Mangament Co., Ltd., to T.P. Talbot, Jr., Commander (Ajs), U.S. Coast Guard Atlantic Area (Feb. 20, 1996)).

**Civil No. 98-1052(SEC)**                                                                                           6

Coleman, Colbro Ship Management Co., Ltd. (Oct. 7, 1997)). On January 23, 1998, Colbro filed this action seeking judicial review pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 702.

**Standard of Review**

The USCG found Colbro liable for the discharge of garbage mixed with plastic into the navigable waters of the United States in violation of the regulations for the implementation of the Act to Prevent Pollution from Ships ("APPS"), and Annexes I, II and V of the International Convention for the Prevention of Pollution from Ships of 1973, as modified by the Protocol of 1978 (MARPOL 73/78), 33 C.F.R. § 151.67, and imposed it a penalty of $10,000, as authorized by the APPS. See 33 U.S.C. § 1908. In so doing, the USCG acted pursuant to section 311(B)(6) of the Federal Water Pollution Control Act, commonly known as the Clean Water Act, 33 U.S.C. § 1321(b)(6) and 33 C.F.R. 1.07. The penalty at issue in this case is a class I civil penalty. See id. (B)(i).

Section 311(b)(6) of the Clean Water Act mandates that "[b]efore assessing a [class I] civil penalty . . . the Administrator or the Secretary, as the case may be, shall give to the person to be assessed such a penalty written notice of the . . . proposal to assess the penalty and the opportunity to request, within 30 days . . . a hearing on the proposed penalty." 33 U.S.C. § 1321(b)(6)(B)(i). The statute makes clear, however, that "[s]uch hearing shall not be subject to section 554 or 556 of Title 5, but shall provide a reasonable opportunity to be heard and to present evidence." Id. In first instance, the USCG hearing officer's "decision to assess a penalty is based upon substantial evidence in the record." 33 C.F.R. § 1.07-65. The standard of judicial review under the Clean Water Act after the amendments introduced by the Oil Pollution Act of 1990, 104 Stat. 484, 533 (1990) is clear:

Civil No. 98-1052(SEC)                                                                                          7

"[The] court shall not set aside or remand such order unless there is not substantial evidence in the record, taken as a whole, to support the finding of a violation or unless the assessment of the penalty constitutes an abuse of discretion . . ." 33 U.S.C. § 3121(b)(6)(G). Even before the amendments introduced by the Oil Pollution Act, the law was settled that "[j]udicial review of a civil penalty imposed by the United States Coast Guard under 33 U.S.C. § 1321(b)(6) is limited to a review of the administrative record. The determination of the Coast Guard must be upheld if it is supported by substantial evidence in the record and if the assessment is neither arbitrary nor capricious." United States v. Chotin Transportation, Inc., 649 F. Supp. 356, 363 (S.D. Ohio 1986) (citing United States v. Healy Tibbitts Construction Co., 713 F.2d 1469, 1474-76 (9th Cir. 1983)). See also Green v. United States Coast Guard, 642 F. Supp. 638, 641-42 N.D. Ill. 1986); Commonwealth of Puerto Rico v. SS Zoe Colocotroni, 456 F. Supp. 1327, 1350 (D.P.R. 1978), aff'd in part, vacated in part, 628 F.2d 652 (1st Cir. 1980); In re Cest Transportation Co., Inc., 434 F. Supp. 748, 749 (N.D. Miss. 1977). Moreover, "[d]e novo review is not appropriate under 33 U.S.C. § 1321(b)(6) because the statute mandates adequate factfinding procedures." Chotin Transportation, Inc., 649 F. Supp. at 360.

The standards for judicial review set forth in § 1321(b)(6)—"substantial evidence" and "abuse of discretion"—"mirror those found in the Administrative Procedure Act, 5 U.S.C. § 706[(2)(A)], and should be interpreted and applied in the same way that they are interpreted and applied under the APA." BP Exploration & Oil, Inc. v. United States Dept. of Transportation, 44 F. Supp. 2d 34, 39 (D.D.C. 1999) (citations omitted). Accordingly, we must determine whether the USCG's determination that Colbro was responsible for the discharge is supported by substantial evidence in the record, and whether the assessment of the $10,000 penalty is arbitrary or capricious, or otherwise an abuse of discretion. Our review is confined to the administrative record.

AO 72A
(Rev. 8/82)

<u>Civil No. 98-1052(SEC)</u>                                                                                                  8

As it is commonly known, "[s]ubstantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" <u>Penobscot Air Serv., Ltd. v. Federal Aviation Administration</u>, 164 F.3d 713, 718 (1st Cir. 1999) (quoting <u>Universal Camera Corp. v. N.L.R.B.</u>, 340 U.S. 474, 488 (1951)). An agency's determination may be supported by substantial evidence notwithstanding the possibility of drawing two inconsistent results from the evidence. <u>See N.L.R.B. v. Hilliard Development Corp.</u>, 187 F.3d 133, — (1st Cir. 1999). <u>See also Doyle v. Paul Revere Life Ins. Co.</u>, 144 F.3d 181, 184 (1st Cir. 1998) ("Sufficiency, of course, does not disappear merely by reason of contradictory evidence."). Deference to the agency, however, "is not due where findings and conclusions are based on inference or presumptions that are not reasonably grounded in the record, viewed as a whole . . . ." <u>Cordero-Trejo v. I.N.S.</u>, 40 F.3d 482, 487 (1st Cir. 1994). By the same token, "credibility findings resting in analysis of testimony rather than on demeanor may 'deserve less than usual deference.'" <u>Id.</u>

In informal proceedings, such as class I civil penalty proceedings, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." <u>Camp v. Pitts</u>, 411 U.S. 138, 142 (1973). Thus, "[t]he task of the reviewing court is to apply the appropriate . . . standard of review . . . to the agency decision based on the record the agency presents to the reviewing court." <u>Florida Power & Light Co. v. Lorion</u>, 470 U.S. 729, 743-44 (1985).

Review under the arbitrary and capricious standard is narrow. The reviewing court may not substitute its judgment for that of the agency, even if it disagrees with the agency's conclusions. <u>See Motor Vehicle Mfrs. Ass'n v. State Mut. Auto Ins. Co.</u>, 463 U.S. 29, 43 (1983); <u>Associated Fisheries of Maine, Inc. v. Daley</u>, 127 F.3d 104, 109 (1st Cir. 1997). The court must examine whether the

**Civil No. 98-1052(SEC)**                                                                                                         9

agency has considered the relevant facts and "articulated a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43 (quoting Burlington Truck Lines v. United States, 371 U.S. 156, 168 (1962)). In reviewing that explanation, the court must "'consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" Id. (quoting Bowman Transp. Inc. v. Arkansas-Best Freight System, 419 U.S. 281, 285 (1974)). "Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Id. See also Airport Impact Relief, Inc. v. Wykle, 192 F.3d 197, 202 (1st Cir. 1999); Associated Fisheries of Maine, Inc., 127 F.3d at 109. While the reviewing court should not try to make up for such deficiencies, it may "'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'" Id. (quoting Bowman Transp. Inc., 419 U.S. at 286.

**Applicable Law/Analysis**

**The Determination of Liability**

Section 151.67 of Title 33 of the Code of Federal Regulations prescribes that "[n]o person on board any ship may discharge into the sea, or into the navigable waters of the united States, plastic or garbage mixed with plastic . . . ." The USCG is specifically authorized to inspect a ship within the navigable waters of the Unites States to determine if the ship is operating in compliance with the regulations for the implementation of the APPS and Annex V of MARPOL 73/78, and "has

Civil No. 98-1052(SEC)                                                                                                    10

not discharged plastics or other garbage" in violation of said statutes. In making such evaluation, USCG enforcement personnel may consider, *inter alia*:

> (1) Records, including receipts, of garbage discharges at port reception facilities.
> (2) Records under § 151.55 or log entries of garbage discharges.
> (3) The presence and operability of equipment to treat ship-generated garbage, including, but not limited to, incinerators, grinders, or comminuters.
> (4) The presence of and adherence to a written shipboard waste management plan.
> (5) The absence of plastics in ship stores.
> (6) Ongoing educational programs to train shipboard personnel of garbage handling procedures and the need for these.
> (7) The presence of shipboard spaces used for collecting, processing, storing and discharging ship-generated garbage.

33 C.F.R. § 151.63. Moreover, "[t]he master, operator, or person who is in charge of a ship shall ensure that if garbage is transported from a ship by shipboard personnel, it is properly deposited into a port or terminal's reception facility." Id. When garbage is discharged to a reception facility, the master or person in charge of the ship shall "ensure that a written record is maintained on the ship of each . . . garbage discharge . . . ." 33 C.F.R. § 151.55(b). Such record must contain, inter alia, the "date and time of the operation," the "name of the port" at which the garbage was discharged, and "the amount of garbage involved, described by volume in cubic meters." Id. (c)(2), (3), (5). The record "must be prepared at the time of the operation, certified as correct by the master or person in charge of the ship, maintained on the ship for two years following the operation, and made available for inspection by the Coast Guard." Id. (d).

In this case, the hearing officer concluded:

> The record is clear that there were plastics mixed with garbage throughout the vessel, when the Coast Guard inspectors boarded, there was an insufficient amount of garbage aboard the vessel for a seventeen man crew, considering their last shoreside discharge and a witness saw and identified the M/V Phoenix Spirit as the vessel dumpling plastic garbage into the EEZ.

**Civil No. 98-1052(SEC)**                                                                                         11

(**Id.**, Letter from R.A. Blais, Commander, U.S. Coast Guard, Hearing Officer, to Pitea Shipping Company, Ltd. (Aug. 7, 1996)). On appeal, the Commandant found that the hearing officer's decision was supported by substantial evidence contained in the record, and that the hearing officer's consideration of the circumstantial evidence contained therein was appropriate.

> While the evidence regarding the amount of garbage remaining on board was not overwhelming, I note that the master had no receipts for garbage being properly discharged at a port facility, the photo of the wardroom mess shows an empty white bag (versus the filled or partially filled other receptacles), and the record contains the testimony of an eyewitness account of a white garbage being thrown overboard from a vessel he positively identified as the PHOENIX SPIRIT. Given these facts, I find the preponderance of evidence contained in the record supports the Hearing Officer's decision that PHOENIX SPIRIT did discharge plastic overboard in violation of 33 C.F.R. § 151 (Subpart A). As noted above, the Hearing Officer is not restricted in considering as evidence only sworn statements. However, his decision must be based on the evidence contained in the record, which I note does not include the photo you requested that was taken of the PHOENIX SPIRIT and used to identify the vessel.
>
> Accordingly, I find that there is substantial evidence in the record to support the Hearing Officer's determination that the violation occurred . . . .

(**Id.**, Letter from David J. Kantor, Deputy Chief, by direction of the Commandant, Office of Maritime and International Law, to William J. Coleman, Colbro Ship Management Co., Ltd. (Oct. 7, 1997)).

Colbro protests that the administrative record "shows that the Coast Guard assessed the penalty conjured upon circumstantial evidence in an arbitrary and capricious manner. There is no objective foundation for the findings contained in the [Coast Guard's] [d]ecision[,] since the contradictory evidence failed to conclusively identify either the offending vessel or the allegedly unlawfully discharged garbage." (**Docket # 21, at 11**). At the outset, we note that in our legal system, juries in both civil and criminal cases are charged that they may rely on both direct and circumstantial evidence as proof of a fact. It is thus absurd for Colbro to complain about the use of

<u>Civil No. 98-1052(SEC)</u>                                                                                       12

circumstantial evidence in this case. <u>See, e.g.</u>, <u>Robinson v. Nat'l Transp. Safety Bd.</u>, 28 F.3d 210, 216 (D.C. Cir. 1994); <u>Sorenson v. Nat'l Transp. Safety Bd.</u>, 684 F.2d 683, 685 (10th Cir. 1982) (both noting the propriety of relying on circumstantial evidence in administrative adjudicatory proceedings). Now, Colbro's challenge to the USCG's determination centers around (1) Mr. Schrader's identification of the Phoenix Spirit, (2) the discard of the Tropic Lure as the possible infringing vessel, (3) the evidence pertaining to the garbage retrieved from the sea by Mr. Schrader, (4) and the evidence pertaining to the garbage found by USCG personnel on board the Phoenix Spirit. We address each of these points *seriatim*.

**The Identification of the Phoenix Spirit**

Colbro attacks the identification of the Phoenix Spirit as the offending vessel on two fronts. First, Colbro questions the reliability of Mr. Schrader's identification at the time of the incident. Second, Colbro questions absence of the photograph of the Phoenix Spirit taken by the USCG, from which Mr. Schrader identified the vessel.

Regarding the first objection, Colbro complains that it is beyond comprehension how was Mr. Schrader able to see "one man throw a large white garbage bag off the [ship's] stern," yet failed to see the ship's name, which "the Phoenix Spirit has clearly stenciled on the starboard side of the vessel right at the stern." (**Id. at 4**). This issue was raised by Colbro at the administrative level, and adequately addressed by the USCG. The USCG did not refute Colbro's contention as to the clarity of the vessel's name. Instead, it chose to give credence to, and thereby relied on, Mr. Schrader's description of the offending vessel and his statement that he was able to witness the overboard discharge of the garbage bag. Mr. Schrader's testimony regarding the incident he witnessed, including the description of the vessel, is contained in the administrative record. (**Docket # 16,**

Civil No. 98-1052(SEC)                                                                                                    13

Testimony of Michael L. Schrader (May 22, 1995), Enclosure No. 1). Mr. Schrader's testimony provides an eyewitness account of the incident with a fair description of the transgressing vessel. His testimony, coupled with his subsequent identification of the Phoenix Spirit—which, as we discuss below, was also appropriate—, provided the hearing officer, and the Commandant as well, with a sound basis to determine that the Phoenix Spirit was liable for the discharge of the garbage.[6]

As to the second objection, it is true, as it contends, that Colbro insistently requested from the USCG the photograph from which Mr. Schrader allegedly identified the Phoenix Spirit as the offending vessel. (**Id.**, Letter from William J. Coleman, President, Colbro Ship Management Company Limited, to Commander T.P. Talbot, Commander of the U.S. Coast Guard Atlantic Area (May 20, 1996); Letter of W.J. Coleman, President, Colbro Ship Management Co., Ltd., to R.A. Blais, Commander U.S. Coast Guard (Aug. 15, 1996)). The photograph, however, was never sent to Colbro nor was it ever made a part of the administrative record. This fact was acknowledged by both the hearing officer and the Commandant. (**Id.**, Letter from David J. Kantor, Deputy Chief, by direction of the Commandant, Office of Maritime and International Law, to William J. Coleman, Colbro Ship Management Co., Ltd. (Oct. 7, 1997); Letter from T.P. Talbot, Commander, U.S. Coast Guard, Hearing Officer, to William J. Coleman, Pitea Shipping Co. Ltd. (May 29, 1996)). The absence of the photograph notwithstanding, the record contains evidence that Mr. Schrader positively

---

[6] Indeed, in reporting to the hearing officer, the USCG Commander for the Seventh Coast Guard District stated that "[t]his entire case is supported by the eyewitness account and positive vessel identification provided by Mr. Michael Schrader, operator of the M/V TRACY LYNN." The USCG Commander informed, moreover, that "[t]he visual identification made by Mr. Schrader placing the M/V PHOENIX SPIRIT as the responsible party was given the most evidential weight by the investigators." (**Id.**, Letter from Eric J. Mosher, by direction of the Commander, Seventh Coast Guard District, to Commander, Coast Guard Hearing Office South (Ajs) (Apr. 15, 1996)).

Civil No. 98-1052(SEC)                                                                                          14

identified the Phoenix Spirit as the offending vessel. (**Id.**, Michael D. Bishop, BM2, USCG Pollution Investigator, Details of the Charge).

It is worth noting that Colbro had the opportunity of requesting a hearing to present any exculpatory evidence in its defense. Colbro even had the opportunity "to provide any written evidence and arguments in lieu of a hearing." 33 C.F.R. § 1.07-25(a). It also had the opportunity to present "the testimony of any witness either through a personal appearance or through a written statement[,]" and to "request the assistance of the Hearing Officer in obtaining the personal appearance of a witness." Id. § 1.07-50. With the exception of presenting arguments which were adequately addressed by the USCG, Colbro took advantage of none of these alternatives.

Colbro now submits a photograph purportedly representing the Phoenix Spirit. This photograph accompanies a tendered sur-reply brief to defendant's reply to Colbro's opposition to defendant's motion for summary judgment. However, we abstain from considering Colbro's tendered brief and photograph for two reasons. First and foremost, the presentation of extra-record materials is unavailing, since our review is confined to the administrative record. Second, Colbro did not seek leave to file its brief as required under Local Rule 311.7 ("No reply brief shall be filed unless leave is obtained from the Court."). Accordingly, the Clerk of the Court is hereby **ORDERED** to strike Colbro's tendered "Surreply to USA's Reply to Colbro's Opposition to USA's Motion for Summary Judgment." The government's request to file a reply brief thereto (**Docket # 24**) is, therefore, **MOOT**.

**The Discard of the Tropic Lure as the Subject Vessel**

Colbro complains that the Tropic Lure "was ruled out as a positive suspect, without a full investigation," even though its speed and course matched those of the vessel observed by Mr.

Civil No. 98-1052(SEC)                                                                                         15

Schrader. **(Docket # 21, at 4)**. USCG investigators ruled out the Tropic Lure as a suspect early in their investigation, based on the Tropic Lure's appearance and position. **(Id.,** "Statement of USCG SN Adam B. Vernon," Enclosure No. 2; "Statement by USCG BM3 Todd E. Hartfiel," Enclosure 4). "These differences were apparent to the investigators on scene and the positive description and eventual identification offered by Mr. Schrader ruled out the M/V TROPIC LURE as a possible suspect." **(Docket # 16**, Letter from Eric J. Mosher, by direction of the Commander, Seventh Coast Guard District, to Commander, Coast Guard Hearing Office South (Ajs) (Apr. 15, 1996)). Therefore, USCG investigators "decided not to pursue the M/V TROPIC LURE issue any further." **(Id.)**. The manner in which USCG investigators handled this issue seems rational and does not strike us as arbitrary.

**The Evidence Pertaining to the Garbage Recovered by Mr. Schrader**

Colbro places great weight on the difference between the garbage bag that Mr. Schrader saw being thrown overboard, and the one that he later retrieved from the sea: the former was white; the latter was clear. **(Docket # 21, at 9)**. What Colbro conveniently does not mention is that in his written statement, Mr. Schrader affirms that in the area where he picked up the clear garbage bag, there were also "two broken white trash bags," which apparently he did not pick up. **(Docket # 16**, Testimony of Michael L. Schrader (May 22, 1995), Enclosure No. 1). At least two plausible, yet consistent, inferences can be drawn from this evidence: one, that the clear garbage bag was inside the white garbage bag that Mr. Schrader saw being thrown overboard, and two, that while Mr. Schrader was able to see only a white garbage bag being thrown overboard, other bags, the clear one among them, were also discharged.

Civil No. 98-1052(SEC)                                                                                                  16

**The Evidence Pertaining to the Garbage Found on Board the Phoenix Spirit**

Regarding the evidence found by USCG investigators on board the Phoenix Spirit, Colbro challenges as "ludicrous" the conclusion that the discharged white garbage bag must have come from the Phoenix Spirit based on the basis that there was a white garbage bag on the ship's wardroom mess. **(Docket # 21, at 9)**. Moreover, Colbro contends that the USCG investigator's determination that the quantity of garbage found on board was "insufficient" on account of the size of the Phoenix Spirit's crew and the time since the last garbage discharge at a port reception facility "lacks any sound, rational, analytical, logical, reasonable or sensible basis." **(Id.)**.

Regarding the first objection, it is not so hard to concede that finding a white garbage liner on board the Phoenix Spirit does not inevitably point to the Phoenix Spirit as the culprit vessel, as such liners may likely be found on board any ship. **(Id.)**. However, the existence of such a liner on board the Phoenix Spirit served as proof, albeit circumstantially, that the discharged garbage bag could have come from the Phoenix Spirit—notwithstanding that it may have come from any other vessel—since the only other vessel at the location and time in question, the Tropic Lure, was safely ruled out as a possible suspect.

Finally, in regard to the second objection, the Commandant acknowledged that "the evidence regarding the amount of garbage remaining on board was not overwhelming." **(Docket # 16**, Letter from David J. Kantor, Deputy Chief, by direction of the Commandant, Office of Maritime and International Law, to William J. Coleman, Colbro Ship Management Co., Ltd. (Oct. 7, 1997)). The Commandant noted, nevertheless, that "the master had no receipts of garbage being properly discharged at a port facility, the photo of the wardroom mess showed an empty white bag . . ., and the record contains the testimony of an eyewitness account of a white garbage bag being thrown

Civil No. 98-1052(SEC) 17

overboard from a vessel he positively identified as the PHOENIX SPIRIT." **(Id.)**. It was on these facts that the Commandant primarily based its decision to affirm the hearing officer's determination. The amount of garbage did not weigh in any significant way in his decision.

Plaintiff's arguments, thus, "are nothing but 'smokescreens without fire.'" Fajardo Shopping Center, S.E. v. Sun Alliance Ins. Co. of Puerto Rico, 999 F. Supp. 213, 234 (D.P.R. 1998) (quoting United States v. Delgado Figueroa, 832 F.2d 691, 697 (1st Cir. 1987)). Accordingly, we find that the USCG's determination that Colbro was liable for the discharge was based on substantial evidence on the record.

**The Amount of the Penalty Assessed**

In determining the amount of a civil penalty under § 1321(b)(6), the following factors shall be considered:

> the seriousness of the violation . . ., the economic benefit to the violator, if any, resulting from the violation, the degree of culpability involved, any other penalty for the same incident, any history of prior violations, the nature, extent, and degree of success of any efforts of the violator to minimize of mitigate the effects of the discharge, the economic impact of the penalty on the violator, and any other matters as justice may require.

33 U.S.C. § 1321(b)(8).

Colbro challenges the amount of the penalty assessed as arbitrary and capricious without presenting any substantiating arguments—other than that the imposition of liability was not based on substantial evidence. In the administrative proceedings below, Colbro also failed to present any "facts, statements, explanations, documents, exculpatory items . . . relevant to the size of . . . [the] penalty" assessed. 33 C.F.R. § 1.07-55. Colbro's only passing reference to any such factors is contained in one of its rebuttal letters to the hearing officer, wherein Colbro's president accuses the hearing officer of having "placed our small company on the defensive side of a draconian fine of

AO 72A
(Rev. 8/82)

$10,000.00 . . . ." (**Docket # 16**, Letter from William J. Coleman, President, Colbro Ship Management Company Ltd., to T.P. Talbot, Commander, U.S. Coast Guard Atlantic Area (May 20, 1996)). In his decision, the USCG Commandant found "the penalty of $10,000.00 appropriate in light of the seriousness of the violation." (**Id.**, Letter of David J. Kantor, Deputy Chief, by direction of the Commandant, Office of Maritime and International Law, to William J. Coleman, Colbro Ship Management Co., Ltd. (Oct. 7, 1997)). Because Colbro did not present any mitigating factors below, and because the USCG determined that $10,000 was appropriate in light of the seriousness of the violation, and such penalty being within the statutory range, see 33 U.S.C. § 1321(b)(6)(B)(i) and § 1908, we find that the USCG did not abuse its discretion in assessing a $10,000 penalty against Colbro.

Having found that the determination that Colbro is liable for the discharge of garbage mixed with plastic into the navigable waters of the United States is supported by substantial evidence in the administrative record, and that the assessment of a $10,000 civil penalty is not an abuse of discretion, defendant's motion for summary judgment (**Docket # 16**) is hereby **GRANTED** and plaintiff's cross-motion (**Docket # 21**) **DENIED**. Accordingly, the Commandant's decision is hereby **AFFIRMED** and this case **DISMISSED**. Judgment shall follow accordingly.

In light of today's ruling, the parties' "Joint Stipulation and Motion for Extension of Time to File Pretrial Report" (**Docket # 25**) is **MOOT**.

      **SO ORDERED.**

      In San Juan, Puerto Rico, this _3d_ day of February, 2000.

                                              SALVADOR E. CASELLAS
                                              United States District Judge

AO 72A
(Rev. 8/82)